IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RICHARD LLEWELLYN            :
2006 Harvard Ave            :
Camp Hill, PA 17011         :
    Plaintiff,          :                                          :
      v.              :
                        :
GOVERNOR JOSH SHAPIRO,       :
                        :        1:25-cv-02287
THE COMMONWEALTH OF         :
PENNSYLVANIA,               :        Judge Kane
                        :
                        :
MS. ANN M KORB              :
                        :
MS. ALTHIA O. BENNETT, ESQ. :                                    :
                        :
DEBORAH HARGETT-ROBINSON,ESQ. :
                        :                    :
                        :
JASON  KAVULICH,            :
                        :
JONATHAN   BOWMAN,          :
                        :
JOHN & JANE DOES #1-#10,    :
                        :
                        :
c/o Governor Josh Shapiro    :
501 North Third Street       :
508 Main Capitol Building    :        JURY TRIAL DEMANDED
Harrisburg, PA 17120         :
    Defendants           :
_____
                        :

## COMPLAINT – CIVIL ACTION

COMES NOW, RICHARD LLEWELLYN ("Plaintiff") through his lawyers, Mark D.

Schwartz, Esq and Gerald Williams, Esquire of Williams Cedar who represents as follows.

INTRODUCTION- SUMMARY OF CLAIMS

1      First, this action arises as a result of The Commonwealth of Pennsylvania's

1

(the "Commonwealth") and the other named defendants acting under color of law in retaliating against Plaintiff as a result of his exercising speech protected under the First Amendment and 42 USC Section 1983 which provides for a civil action against persons named in their individual capacity for depriving him of protected rights including the right of free speech. Furthermore, case law found at *Ex Parte Young*, 209 U.S. 123 (1908) provides for seeking prospective relief against a state official in his or her official capacity.  In this case Governor Shapiro, ultimately responsible as the chief executive of the Commonwealth for upholding the law and the proper administration Commonwealth departments and employees, is sought to be enjoined from allowing the ongoing violations of state and federal constitutional law that Plaintiff alleges has and continues to take place by and within his administration.

2.      Second, this action arises as a result of the Commonwealth's and the individual defendants' direct violations of the Commonwealth's Older Adults Protective Services Act of November 6, 1987, P.L. 381, No. 79 ("OAPSA") when it comes to:

- intimidating Plaintiff with knowledge that their action will "obstruct, impede, impair, prevent or interfere with the administration of this act or any law intended to protect older adults from mistreatment." (See definition of "intimidation at Section 103 and Section 302 (c.1) providing for this civil action, compensatory damages, treble compensatory damages, and punitive damages)

-discriminating, retaliating against Plaintiff [for cooperating with the agency's purpose and making reports] and disciplining him in violation of Section 302 (c) (providing for this civil action, compensatory damages, treble compensatory damages, and punitive damages)

Violations of OAPSA took place as a result of the Commonwealth's and other named defendants' obstruction and retaliation against Plaintiff when it came to responses to public Right to Know ("RTK") requests.

3.      Third, this action arises as a result of the Commonwealth's and other named defendants' direct violations of Pennsylvania's Right-to Know Law, Act of February 14, 2008, P.L. 6 No. 3 as amended ("The Right to Know Law") when it came to their obstruction of and retaliation against Plaintiff when it came to responses to public RTK requests.

4.      Fourth, this action also arises out of Plaintiff's reports to his superiors and other independent entities of waste and wrongdoing, including fraud in terms of masking and withholding monitoring statistics, which ultimately resulted in unlawful retaliation against him by the Commonwealth and other named defendants that has included stripping him of responsibilities in overseeing and providing responses to RTK requests and then unlawfully suspending him altogether without pay. Accordingly, Plaintiff brings this action pursuant to the Pennsylvania Whistleblower Law, which was specifically enacted by the Commonwealth of Pennsylvania to prohibit precisely the kind of unlawful and retaliatory employer conduct and actions that the Commonwealth has took against Plaintiff.

<u>THE PARTIES</u>

5.  Plaintiff RICHARD LLEWELLYN is an adult male who resides at 2006 Harvard Ave., Camp Hill, PA 17011. He has been employed by the Commonwealth, based in its Department of Aging ("PDA") headquarters in Harrisburg from approximately June 26, 2017, until July 9, 2025, when he was notified that he was being suspended without pay from his position of Aging Service Supervisor. On or about October 2, 2025, marked the sixtieth and supposedly the last working day of his suspension. However, Plaintiff was not informed until October 6, 2025, by defendant

Commonwealth of Pennsylvania 's Office of Administration's (OA) personnel Emily Shapard that there was insufficient evidence to support bogus and retaliatory OA allegations against him over the deletion of files, that had resulted in his suspension without pay. Plaintiff was then informed that he was being reinstated and would be made whole regarding back pay. Incredibly, during that very same telephone conversation, Plaintiff was further advised that OA was again suspending him without pay for up to sixty working days, this time for allegedly violating PDA Confidentiality Policy during a September 23, 2025, a public Town Hall meeting at the time when he was solely a private citizen given his then suspension from employment. The latest in terms of retaliatory harassment and grasping of straws came on October 15, 2025, with OA's first-time insistence that Plaintiff turn over his Commonwealth-issued laptop to the Office of Administration. At this time, Defendants continue to look for any excuse to retaliate against and/or fire Plaintiff.

6.      Defendant Governor Josh Shapiro must be specifically enjoined from this improper and illegal retaliation by his subordinate departments and employees, all legally liable to Plaintiff given their deliberate failure to exercise their affirmative governmental responsibilities in terms of following and carrying out the above-referenced laws, violating those laws, and illegally retaliating against Plaintiff.

7.      Defendants GOVERNOR JOSH SHAPIRO, SECRETARY OF AGING JASON KAVULICH, DEPUTY AGING SECRETARY JONATHAN BOWMAN, CHIEF DEPARTMENT OF AGING COUNSEL ALTHIA O. BENNETT, ESQUIRE,  DEPUTY CHIEF GENERAL COUNSEL DEBORAH HARGETT-ROBINSON, ESQUIRE, OFFICE OF ADMINISTRATION ANN M. KORB,  together with various JOHN and JANE DOEs, in various capacities, are legally liable to Plaintiff given their deliberate failure to exercise their affirmative governmental responsibilities in following and carrying out the above-referenced

laws, violating those laws, and illegally retaliating against Plaintiff.

8.    Defendant THE COMMONWEALTH OF PENNSYLVANIA ("the Commonwealth" or "Defendant Commonwealth") is a state government entity, corporate and politic, which has been a member state of the union, known as the "United States of America" since ratifying the U.S. Constitution on December 12, 1787. At all times pertinent, it has been Plaintiff's employer and is headquartered at 501 North Third Street,508 Main Capitol Building, Harrisburg, PA 17120, at all times relevant hereto, Defendant Commonwealth acted through its officers, agents, servants and employees who, cloaked with governmental authority, were purportedly acting under color of law within the course and scope of their Commonwealth employment when it came to Plaintiff.

### FULFILLMENT OF CONDITIONS PRECEDENT

9.    Plaintiff has fulfilled any and all conditions precedent to the institution of this action under Federal and State law having served pertinent officials, including but not limited to, Governor Shapiro, Attorney General Sunday, and General Counsel Selber by certified mail on August 21, 2025, a "Notice of Intention to Commence Civil Action Against the Commonwealth of Pennsylvania and It Officials" pursuant to 42 Pa C.S. § 5522(a)(1).

### JURISDICTION & VENUE

10.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §1331 because this is a civil action arising under federal law.

11.    Plaintiff also invokes the supplemental jurisdiction of this Court over his related claims arising under state law pursuant to 28 U.S.C. §1367(a), all of which are so related to the federal law claims that they form part of the same case or controversy under Article III of the

United States Constitution.

12.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §

1391(b) and (c), since both Plaintiff and Defendant reside and do business in the Eastern District

of Pennsylvania, and since the events giving rise to Plaintiff's claim occurred in the Eastern

District of Pennsylvania.

<u>FACTUAL ASSERTIONS</u>

13.     Plaintiff is an adult male, born on December 23, 1966. He earned an Associate's

Degree in Computer Information Systems and Support Specialist in July, 2016 from Harrisburg

Area Community College. Immediately thereafter, Plaintiff began service to the Commonwealth

first in terms of resolving technology issues for the Pa Department of Human Services Help

Desk. Subsequently, he was offered and accepted a "contractor" position of Program Specialist

with the PDA Protective Services Office. Within one year, while still a "contractor", his duties

switched from Aging Services Specialist to those of Business Analyst. On December 14, 2020,

still as a "contractor", he was offered and accepted the position of PDA Protective Services

Business Analyst II. On August 8, 2022, as opposed to serving in a contractor's position, he was

formally employed as a Commonwealth Aging Services Supervisor within PDA's Bureau of

Protective services and continued to be responsible for providing Business Analyst functions, in

addition to his new supervisory functions, all of which included oversight regarding Protective

Services RTK requests made to PDA.

14.   According to PA.GOV website, "The **Pennsylvania Department of Aging's Office**

**of Protective Services** is responsible for overseeing and implementing the Older Adults

Protective Services Act. ("OAPSA") for individuals over the age of 60. Its main functions

include:

6

* P**roviding access to services** for older adults who cannot protect themselves and are at risk of abuse, neglect, exploitation, or abandonment.

* **Safeguarding the rights** of older people and offering necessary services for their safety.

* **Addressing problems** such as finding, reducing, fixing, or stopping abuse, neglect, exploitation and abandonment.

***Setting up protective services** and raising awareness about available services to educate the public." (Emphasis added)

15.     Plaintiff came to understand that the PDA, particularly under the leadership of Shapiro's PDA Secretary Defendant Kavulich, Defendant Bowman, Defendant Bennett and Defendant  Hargett-Robinson, was not fulfilling its affirmative legal obligations when it came to affording Protective Services to older Pennsylvanians and complying with the Right to Know Law, instead choosing to retaliate against Plaintiff who urged and acted to secure compliance with applicable law.

16.     In 2017, Plaintiff cooperated with an Office of State Inspector General ("OSIG") investigation into PDA's Office of Protective Services which resulted in the issuance of a Findings Report in 2018 as a public report, and then re-released it in 2019 in a redacted version. Several recommendations/initiates included centralized intake, fatality reviews, an online public Protective Services abuse reporting form, daily review/approval of statewide No Needed Reports of Needs, enhanced assistance in managing caseloads, and the introduction of a Financial Abuse Specialist Team. These initiatives were approved by prior PDA Secretary Torres. However, the oversight initiatives were subsequently rescinded by Defendant Kavulich.

17.     Purportedly, due to continuing concerns with respect to Protective Services, in November of 2022, a second OSIG investigation was started. Plaintiff received a call from Erik Smith of the OSIG asking if Plaintiff would be willing to provide aggregate Protective Services data and information for OSIG's current investigation. Smith specifically stated that the OSIG did not want PDA executives to know that Defendant PDA was being investigated and that OSIG wanted Plaintiff to provide the requested data without PDA's knowledge.

18.     On January 17, 2023, Josh Shapiro began his first term as Governor of Defendant Commonwealth.

19.     On January 23, 2023, Governor Shapiro nominated Defendant Jason Kavuich, a former Lackawanna County Area Agency on Aging head, to serve as his PDA Secretary of Aging, a position which is required to affirmatively supervise Pennsylvania's Area Agencies on Aging ("AAAs") and ensure that the Commonwealth's 52 AAAs provide quality services to older adults residing therein.  On May 3, 2023, Jason Kavulich was confirmed by the Pennsylvania Senate and has since been serving in such capacity.

20.     Given his position as Commonwealth Aging Services Supervisor within PDA's Bureau of Protective Services, Plaintiff was responsible for the Bureau's assembly of Protective Services information in response to Right to Know requests made pursuant to The Right to Know Act.

21.     Notwithstanding clear legally imposed responsibilities in terms of complying with the Right t to Know Act, on no less than three separate occasions commencing in 2022, Defendant Jonathan Bowman, then Plaintiff's supervisor in the position of Director of the Bureau of Quality Assurance, bragged to Plaintiff that he is "good at finding loopholes to deny

right to know requests." As detailed hereinafter, at some point Defendant Bowman instructed

Plaintiff not to provide RTK data to PDA Legal without first discussing it with him.

22.    On March 27, 2023, Defendant Kavulich issued an email to the Commonwealth's

AAA network outlining a "functional realignment" of the Bureau of Protective Services.

Notwithstanding said realignment, "data" and responses to RTK requests were still treated as

falling within Plaintiff's responsibilities.

23.    On or about July 13, 2023, RTK request #37-023 from Mark Levy of the

Associated Press was received by PDA and forwarded to Plaintiff for a response. The request

asked for records regarding fatalities and the number of days those cases remained open, data

which Plaintiff confirmed was in existence. In conjunction with this, Defendant Deborah

Hargett- Robinson, Esq emailed Plaintiff on July 13, inquiring about PDA's retention policy,

specifically asking what the Department did with this data, and if it was previously reported or

provided to anyone. She asked if this data was included in an existing report anywhere. On July

17, 2023, Plaintiff responded attaching the 2022 "Cases by Days Active" data with a spreadsheet

providing all case terminations due to death. On July 18, Defendant Hargett-Robinson, Esq asked

"Do we have any time frames or retention policy on how long we maintain electronic reports for

PS data?" Incredibly, these questions all pertained to legal matters, which she, as a lawyer

assigned to PDA should have known the attendant answers.  Defendant Hargett-Robinson's

repeated insertion of herself and her inquiries on retention policy were unquestionably geared to

restrict Plaintiff's compliance with the Right to Know Law.  Plaintiff felt threatened.

24.    On July 31, 2023, Plaintiff sent Erik Smith of OSIG the email chain, including

Ms. Hargett-Robinson's questions, and other data that Smith had requested.

25.     On or about August 4, 2023, RTK request #45-023 was received by PDA from Scranton's Times Tribune Review for Protective Services data. This request was forward to Plaintiff to formulate a response.

26.     On August 10, 2023, during Plaintiff's weekly 2:30 status meeting with Defendant Bowman, Bowman stated "I'm very quick to find ways to say 'no'." He went on to talk about loopholes and being skilled at finding them to deny RTK requests, stating "I'm not sure if you agree with that approach or not." Of course, Plaintiff made a point of not agreeing with that approach and did not express agreement. Plaintiff was otherwise intimidated by the conversation and fearful of retaliation should he express disagreement with Bowman's unethical comments.

27.     On August 21, 2023, Plaintiff attended a 9:00 a.m. meeting with PDA staff members Leslee Frymyer, Tammi Beers-Franklin and Defendant Bowman. Bowman tasked the three staff members to identify all existing reports involving Protective Services data. Plaintiff was told that the list was to be provided to the PDA Deputy Secretary by noon that day. Defendant Bowman said that the reason for the task was because Legal wanted to eliminate any unnecessary reports. The deletion of "unnecessary" report templates would prevent the future use of data for PDA responses to RTK requests, allowing PDA more opportunities to deny RTKs for Protective Services data as those reports would no longer exist, contravening the directives of the Right to Know Law. In retrospect, Plaintiff wonders if this request for "elimination" was truly Legal's request as opposed to Defendant Bowman's request or idea to further assist him to deny RTK requests.

28.     On August 31, 2023, Plaintiff sent an email to Defendant Bowman referencing Bowman's prior bragging about being "good at finding loopholes to deny RTK requests."

Bowman's response was that since Plaintiff had to compile the data, that Bowman could deny the RTK request because the data was not in PDA's possession. However, the fact that existing data must be formatted or pulled into a single document is not a valid reason to deny the request. According to applicable law, if an agency is in possession of data, then it must provide it in raw form.

29.     Also, on August 31, 2023, Plaintiff sent an email to Erik Smith at OSIG relating what took place during his meetings of August 10 and August 21. Plaintiff concluded that email with the following statement:

> I simply don't understand why PDA goes to great lengths to avoid being transparent with Protective Services data that clearly demonstrates the failure of this Department to hold the AAA's accountable, and thus leaving older adults in need of protective services at risk, up to and including death due to inaction by the AAA's.

30.     During the weekly status meeting with Defendant Bowman of November 30, 2023, Plaintiff was advised that under the current reorganization, the monitoring of AAA Protective Services programs would be transitioned to the Bureau of Quality Assurance and that Plaintiff as Division Director would have supervisory responsibilities for monitoring AAA data in addition to Protective Services data, reports, and RTK requests. That reorganization took place on December 1, 2023.

31.     On or about December 10, 2023, a warrant was issued for Steve Rodgers, PDA Bureau Director. Upon information and belief, he was never suspended pending court proceedings and still had access to vulnerable older adults' personal information. Plaintiff raised concerns over this with the OSIG.

32.     On December 20, 2023, RTK request #71-023 from Ms. Angela Couloumbis of media organization "Spotlight PA" was received by the PDA, requesting amongst other things

data on investigations, monitoring reviews and "the number of adults who dies during an open investigation of a report of need".

33.     Also, sometime in December of 2023, Plaintiff received a call from OSIG representative Erik Smith for a five-year history of monitoring data for all 52 AAA's. Plaintiff told him that he had this data but would need to compile it for him. On December 21, 2023, Plaintiff sent a text message to Smith letting him know that Plaintiff's staff would compile the data and would be ready when Plaintiff would return from vacation after January 1, 2024.

34.     Commencing in 2024 and continuing into 2025, Plaintiff together with others met with multiple legislators, contacted advocacy groups and the Governor's office, raising concerns about the PDA, including its responses to RTK requests, and providing supporting evidence.

35.     January of 2024 brought with it initial development of PDA's Comprehensive Agency Performance Evaluation ("CAPE"), a monitoring process for the Commonwealth network with respect to AAA's and a tool for Protective Services'' use. Notwithstanding Plaintiff's position as "Protective Services Aging Services Supervisor", he learned that employee Barb Hinds was told by Defendant Bowman that Plaintiff and his staff would not be involved in CAPE's development; that "they will be told what they're doing and they'll do what they're told." Plaintiff and others had previously posed objections regarding CAPE changes that appeared to not benefit older adults alleged to have been abused, but instead appeared to benefit the AAAs' in terms of obtaining compliant scores with respect to CAPE.

36.     On or about January 22, 2024, the PDA received an extensive RTK request #02-024 from the group Disability Rights, PA, the principal group in Pennsylvania dedicated to the disabled. On January 24, 2024, Defendant Bowman set a meeting with Plaintiff, Charlene Lane, PS Bureau Director, and Donna Wolgemuth to discuss the request. As Plaintiff later reported that

same day to OSIG, "During the meeting he (Defendant Bowman) bragged about how he masked the Meeting Subject with two "xx's" so that it couldn't be found if searched in the future. . . He was also alluding to how he likes to obscure documents so they cannot be subject to RTK requests. To my surprise, Charlene agreed with him and expressed that she thinks that's a good idea." What was masked on Bowman's meeting notice was the RTK request number "02-024" itself.

37.     On or about February 22, 2024, a RTK request came from AP reporter Marc Levy. This was the same request as a RTK request previously made by his wife, Angela Couloumbis on behalf of Spotlight, PA in December 2023, in that both asked for death data. PDA's response to Spotlight, Pa's RTK request had been made on or about February 3, 2024. With respect to the AP RTK request, Defendant Hargett-Robinson sent Plaintiff a request for the data, declining to include Defendant Bowman on her email. However, during a subsequent telephone call with Defendant Bowman, Plaintiff advised him of her request. Defendant Bowman instructed Plaintiff not to respond to any of Legal's requests. Defendant Bowman instructed Plaintiff instead to forward Legal's questions/ inquiries to Defendant Bowman. Furthermore, Defendant Bowman told Plaintiff that he wanted to give data that was outdated, used for a previous RTK request for the same data, wanting to avoid additional questions from the media. Plaintiff disagreed and advised Defendant Bowman that there was more current data available. However, Defendant Bowman did not want to rerun the report with current data. On March 1, 2024, Defendant Bowman emailed Plaintiff stating "Rich-I will take care of this request……" Thus, Plaintiff was removed from further involvement with the AP request.

38.   Subsequently, Plaintiff came to learn that the data for the AP request was intercepted and changed by Defendant Bowman. In an email of March 1, 2024, to Erik Smith of the OSIG, Plaintiff stated:

> My approach to providing the data was intercepted and changed by Jonathan when he was looped into the conversation on 3/1/24. (see attached email thread). After which, he intentionally manipulated the date to be provided. He purposely diluted the data in an effort to ensure no further questions. He said (and of course I'm paraphrasing from memory, but this is literally the message he conveyed), "This data was provided to Levy's wife, so we can just give him the same report, but add the numbers into the two timeframe buckets he requested. I don't want to rerun the report because the numbers will then be different, and I don't want him asking why they're different. I don't know if they talk to each other about their work or if they don't share details with each other about the articles they're working on. I just want to avoid them comparing reports and seeing that the numbers are different and then asking us why they're different."

After the above-quoted language, a clearly frustrated and fearful Plaintiff asks, "Please help!!!!"

39.   Also, on March 1, 2024, Plaintiff requested a meeting with PDA Legal Counsel as a result of Defendant Bowman's admission of data manipulation.

40.   Plaintiff learned that PDA received another RTK request from Spotlight PA on or about March 9, 2024, for Protective Services data. The request included (1) case determinations by "date buckets" from 2016 through 2024, and (2) investigation initiation data for the same time period by categorization.

41.   On March 29, 2024, Plaintiff scheduled a meeting set for April 1 with PDA Legal Representatives Defendant Althia Bennett and Defendant Hargett-Robinson setting forth in an email under the heading "Concerns I would like to discuss", the following:

> *Jonathan has verbally communicated to me on multiple occasions that he "is good at finding loopholes to deny right-to-know requests."

> *Jonathan has verbally instructed me that I may not respond to or provide date in response to a RTK request sent directly to me by PDA Legal staff without consulting him first.

*I find Jonathan's directive to be contradictory of my moral beliefs and I feel intimidated by his mandates. I do not feel comfortable speaking against his directives with him.

*I have been cooperating, as a witness, with the OISG's current investigation into PDA's activities, and I have made them aware of his directives.

That same day, Plaintiff forwarded his email to Legal to OSIG representative Erik Smith. Eventually, the meeting with Legal took place wherein the lawyers attending tried to placate Plaintiff by saying that they would not participate in "shenanigans" and were morally committed to doing the right thing, but their previous and subsequent actions belied these statements.

42.    On April 8, 2024, Plaintiff texted OSIG representative Erik Smith, asking him if he would speak to Plaintiff's two staff members who were willing to be witnesses. Mr. Smith responded on April 16, 2024, that he was willing to speak with them, asking them first to contact the Tipline. Intimidated, worried and afraid, the staff members did not come forward to the Tipline.

43.    In conjunction with a new RTK request, on March 29, 2024, Defendant Hargett-Robinson asked Plaintiff if certain investigations were tracked, copying Defendant Bowman. Plaintiff confirmed to her that, in fact, the data was tracked. Defendant Bowman subsequently removed Plaintiff from dealing with the request, stating in an email to Plaintiff that "this RTKL requested is being processed through M&A," (PDA's Metrics & Analysis staff)

44.    During the April 10, 2024, weekly staff meeting, Defendant Bowman told Plaintiff that his Crystal Reports License will be removed. This rendered Plaintiff unable to run, create or modify Protective Service data reports.

45.     On or about May 23, 2024, Plaintiff filed a witness statement with the Governor's Office of Administration.  In turn, Ms. Melissa Lawton, of the Office of Administration, instructed him to contact the OSIG.

46.     On May 31, 2024, Plaintiff filed a complaint with OSIG online. In a subsequent email to Erik Smith and John T Roman, Plaintiff asked that various attachments be appended to his original submission.  Further, Plaintiff stated that "…. After reporting my concerns to PDA Legal, Jonathan updated my Position Description in ESS on May 1, 2024. He also noted that "two of my staff are also being targeted with retaliation."  At the time, Plaintiff viewed this position update as another tactical decision to remove him from data responsibilities.

47.     On or about July 17, 2024, another RTK request was received by PDA from Spotlight PA in part requesting historical monitoring outcomes/data with respect to PDA'S supposed oversight of the AAAs.  Defendant Bowman told Plaintiff that the request could be denied as PDA did not have that data.  To the contrary, Plaintiff advised Defendant Bowman that Plaintiff had compiled the data approximately two weeks ago at the request of OSIG. Plaintiff further told Bowman that he was cooperating with the OSIG investigation and considered himself a whistleblower. Defendant Bowman's response was "Oh, you're a witness."

48.     On August 27, 2024, Plaintiff rescheduled a meeting with PDA legal staff defendants Althia O. Bennett, Deborah Hargett-Robinson, and Business Analyst Ashley Gounley. In an email of that date under the heading "Agenda", Plaintiff noted in part :

> * that Defendant Bowman had pulled Plaintiff off of a RTK request the week after Plaintiff had previously met with legal and that "I get the impression that his actions since our last meeting are intended to remove me, the Protective Services Subject Matter Expert, from Protective Services data so that he can manipulate responses to data requests to support his non-transparency approach.

> * that Defendant Bowman had informed Plaintiff that he would no longer have anything to do with PS data, report writing, or RTK requests.

16

\* that given his removal from the process that there would be inadequate ability for the PDA to accurately and legally provide RTK responses.

49.     Subsequent communication from Defendant Hargett-Robinson on September 17, 2024, emphasized that confidentiality would not be provided to Plaintiff and his concerns. Surprised by this and mindful of an attorney's obligations when it came to allegations of continued wrongdoing, Plaintiff responded on September 19, stating: "That's OK, Deborah. I understand. However, I'm wondering—given that you would never be involved in a cover-up, -where does your obligation to the 'Agency' end in relation to the Agency's alleged wrongdoings? As an Officer of the Court and a Civil Servant, don't you have an obligation to confidently [sp for confidentially] hear, without bias, the allegations a whistleblower is attempting to convey to you and THEN SUBSEQUENTLY decide if it's confidential information you should relay to either the Agency or to your superior, or even dismiss?" Thus, by doing so, Plaintiff emphasized Attorney Code of Professional Responsibility considerations which clearly Attorney Hargett-Robinson had not considered.

50.     On September 19, 2024, Peter Hans submitted a RTK request that was identical to Spotlight PA's July 17, 2024, RTK request referenced hereinbefore. Mr. Hans followed up by contacting PDA on October 2, whereupon PDA claimed that his request had never been received in the first place. Accordingly, Mr. Hans was told that his RTK request would now be considered received on October 2, 2024.

51.     Coincidentally, on October 2, 2024, Defendant Bowman called Plaintiff to discuss monitoring outcomes history. During that conversation Defendant Bowman admitted that he had deleted 15 monitorings assembled by Plaintiff from the previous PDA's August 26, 2024, response to the Spotlight PA request.

52.     As it turned out, PDA made two different responses to Mr. Hans' RTK request. On October 9, 2024, the PDA responded by providing the complete data that Plaintiff had originally assembled; data that had not been altered by Defendant Bowman. However, subsequently, on October 16, 2024, the PDA sent Mr. Hans a "revised response" stating that "corrected" data was attached. This version did not include the 15 monitorings that Defendant Bowman had deleted, thus rendering it the same as the false and incomplete response previously made to Spotlight, PA.

53.     Meanwhile, Defendant Bowman's above-referenced admission of data deletion was communicated by Plaintiff to Defendant Hargett-Robinson via an October 3, 2024, email. Plaintiff copied this email to Erik Smith and the OSIG, together with a spreadsheet showing the original unaltered data with highlighted cells showing Defendant Bowman's data removal.

54.     Defendant Hargett-Robinson responded on October 7, 2024, to Plaintiff, copying other departmental lawyers, as well as the OISG, accusing Plaintiff of sharing a "confidential internal legal document" with an outside agency "before it has been reviewed by the legal office and authorized for disclosure." Furthermore, she instructed Plaintiff not to "disclose any agency document outside of the agency without prior authorization from the legal", clearly and improperly attempting to restrict his whistleblowing communications to OISG or other agencies. Ironically, along with the Governor's Office of Administration, OSIG was an entity that Legal had initially told Plaintiff to contact.

55.     In a subsequent October 10, 2024, in-person meeting with Defendant attorneys Althia O. Bennett and Deborah Hargett-Robinson to discuss Plaintiff's concerns about Defendant Bowman, both attorneys stated that Plaintiff may not copy outside agencies, specifically including OSIG, on emails. Further, Plaintiff was told that copying the OSIG on his previous

October 3, 2024, email made PDA Legal look complicit in the manipulation of data by Defendant Bowman. Given their past interaction with Plaintiff, upon information and belief, these Defendant attorneys and PDA Legal not only "looked", but were in fact, complicit in the continued manipulation of data by Defendant Bowman in violation of applicable law.

56.     Complicity by PDA Legal was followed by retaliation, defamation, and false light character assassination as a result of an email of October 16, 2024, from Defendant Hargett-Robinson to Plaintiff copied to others, including the OSIG, falsely claiming that the document prepared and supplied by Plaintiff on October 3, 2024, referenced hereinabove contained "inaccurate information regarding some AAA's" and that "The document should not be used as a fully accurate account of the monitoring of the AAA's." Aside from smearing Plaintiff, Defendant Hargett- Robinson went so far as to disclaim any personal responsibility by saying "I feel comfortable that the documents I have provided in response to RTKL requests have been accurate."

57.     Later that day, Plaintiff sent Defendant Hargett-Robinson and Defendant Bennett, along with others, an email beginning with "I am utterly confounded by your response" and then stating how he had compiled the information utilizing Department-issued post-monitoring correspondence to the AAAs and reiterating "Again, the concern I have been consistently expressing is that 15 AAA monitoring records have been deleted from the document" and that Defendant Bowman admitted and took personal responsibility for the deletion.

58.     Despite Defendant Hargett-Robinson's false allegation that Plaintiff's work was inaccurate and that it should not be used as official data, Defendant Bowman continued to rely on Plaintiff when it came to monitoring history data.

59.     On November 15, 2024, Plaintiff received a call from Matt Updegrove and Jessie Whiteman of the Human Resources Office of Defendant Governor's Office. The call, labeled as an "investigatory interview" began with Mr. Updegrove explaining that the call concerned RTK requests for PDA monitoring data. However, what the call turned into was an allegation that Plaintiff violated an "IT Acceptable Use Policy" by forwarding Commonwealth email to Plaintiff's personal email account. Yet, given Defendant Bowman's deletion of information, Plaintiff was concerned that his office emails would also be destroyed after he had heard from multiple sources that Defendant Kavulich was "pissed" at him and was "targeting him". Accordingly, Plaintiff engaged in the active preservation of evidence.

60.     On November 19, 2024, Plaintiff submitted an extensive Commonwealth Employee Witness Statement with a host of historical attachments pertaining to his mistreatment.

61.     On December 7, 2024, Plaintiff asked OSIG to intervene on his behalf due to the retaliation taken against him:

> As you know, I'm currently being retaliated against as a whistleblower. I've been stripped of all my responsibilities and literally have nothing to do every day. Because PDA wrongdoers don't want me involved in PS data, policy development, etc…they have transitioned all of my PS data responsibilities to the Bureau of Metrics & Analytics (BM&A). Leslee Frymyer, is requesting a new FTE position to perform the functions that have been taken away from me because she doesn't have the staff to fulfill my previous job.

62.     On December 10, 2024, Plaintiff filed a complaint with the Auditor General alleging fiscal irresponsibility and waste by PDA in conjunction with costly personnel changes pertaining to dealing with monitoring data, given Plaintiff's retaliatory exclusion from the process.

63.    On January 14, 2025, Defendant Kavulich issued a new "Confidentiality Policy" retaliating against Plaintiff's continued whistleblowing, in part providing that "All personnel are prohibited from disclosing or disseminating any confidential information to external entities, or sources without the express written permission of the Secretary, Deputy Secretary or Department's Office of Chief Counsel." "External entities" specifically named included the news media and RTK requests, as well and Non-Department entities which as defined would include the OSIG.

64.    On February 6, 2025, Plaintiff filed a 68-page complaint with Defendant Governor's Office of Administration concerning the retaliatory and hostile work environment he has been forced to work in under the administration of Defendant Kavulich. Plaintiff provided over 12 witnesses, none of whom were contacted. Given the lack of follow up activity from Defendant Governor's Office of Administration's, Plaintiff believes that the investigation, if it was ever opened in the first place, has been closed. Instead of addressing Plaintiff's concerns and rectifying the situation, Defendant Office of Administration itself instituted a host of subsequent retaliatory investigations of Plaintiff.

65.    On March 18, 2025, Plaintiff heard Defendant Kavulich testify before the State House Aging and Older Adult Services Committee stating that PDA cannot be concerned with the "what ifs" in Protective Services investigations, thus providing a rationale for his elimination of certain monitoring measures. Plaintiff took issue with that public statement, creating a personal Facebook post that did not reference his PDA position and used nothing in the way of state materials or means of communications.

66.     On April 23, 2025, the Office of Auditor General held a meeting with the PDA to discuss CAPE monitoring. However, Plaintiff's superiors excluded Plaintiff from the meeting, despite the fact that he was supervisor for the Protective Services CAPE monitoring process.

67.     At the May 21, 2025, weekly staff meeting, Plaintiff's noted his removal from access to the BAPE Protective Service SharePoint file server. In response PDA Bureau Director Leslee Frymyer directed him to simply copy the folders/files from the V-drive to the new SharePoint folder.

68.      In late May or early June of 2025, the Auditor General's investigation manager, Kimberly Georgetti, contacted Plaintiff acknowledging receipt of his December 2024, submission and requested that Plaintiff participate in the current Auditor General's investigation. Plaintiff agreed to do so, providing a series of emails to the Auditor General's office containing factual evidence and data.

69.     On June 18, 2025, Plaintiff received a call from Defendant Governor's Office of Administration accusing him of misbehavior in conjunction with his Facebook posting. As contained in Plaintiff's Commonwealth Employee Witness Statement of June 25, 2025, Plaintiff explained that what he did constituted protected citizen comment and opinion, "… I disagree with how Kavulich is conducting monitoring for compliance with the law. We've seen too many victims die prematurely because of the inaction of a AAA's Protective Services staff. These premature deaths might have been prevented if the Department and the AAA recognized the importance of the "what-ifs" and didn't water down the monitoring …"

Included in his Witness Statement was a request: "As I stated in my August 8th email, I would like a response regarding when is the OA going to do something to uphold the Whistleblower

LAW … and stop this unlawful harassment of me by PDA?" To date there has been no conclusion to the investigation.

70.    During the June 25, 2025, weekly staff meeting, Plaintiff advised Ms. Frymyer, that pursuant to her direction referenced above, he had attempted to copy the files three times and that each attempt failed. Plaintiff suggested that they would need to either have IT copy the files or give Plaintiff and his staff access to the BPS SharePoint file server. After each failed attempt, Plaintiff deleted the failed and incomplete files before attempting to copy them again in order to prevent the standard Windows, "Replace or Skip File" prompt due to the existence of partially copied files. This would allow the next attempt to copy the files to run without the need for human interaction.

71.    On July 9, 2025, at approximately 3:00 p.m., Plaintiff received a call from Defendant Emily Shapard, of the Office of Administration, falsely alleging that Plaintiff had deleted files without a legitimate business need or authorization from his chain of command. During that call Plaintiff fully refuted the claims, including the fact that what he did was pursuant to direction from Ms. Frymer. Notwithstanding, during that call, Plaintiff was advised that he was being placed on suspension without pay. This was supposed to last for 60 business days; until on or about October 2, 2025.

<u>Retaliatory "Investigations" Against Plaintiff by Defendant Governor Office of Administration</u>

72.    As a result of his whistleblowing, advocating compliance with applicable law, Plaintiff has suffered and continues to suffer Defendant Kavulich's targeted harassment and Defendant Governor Shapiro and Defendant Shapiro's Office of Administration's multiple retaliatory and unfounded investigations.

73.     The first investigation as referenced hereinabove alleging Plaintiffs violation of IT Acceptable Use Policy was initiated on November 15, 2024. This claimed that Plaintiff had forwarded Commonwealth email to his personal account. On December 19, 2024, Plaintiff was exonerated with no corrective action whatsoever.

74.     The second investigation alleging that Plaintiff used confidential Protective Services case photographs in a Facebook post was initiated on June 18, 2005. After Plaintiff demonstrated that he did not do so, the allegation was changed to "Inappropriate Conduct". As of the present time no update has been provided by the Office of Administration apparently without resolution.

75.     The third investigation initiated on July 9, 2024, involved Plaintiff's immediate suspension from his employment without pay as a result of allegations that Plaintiff had deleted files without business approval or business justification. Subsequent to the approximate October 2, 2025 date that the investigation was to end, Plaintiff was notified on October 6, 2025, by a telephone call from Emily Shapard of Defendant Office of Administration that the matter had been resolved without the imposition of corrective action, thus absolving Plaintiff. Plaintiff was told that he was being reinstated and would receive back pay.

76.     Simultaneously with his notification of reinstatement, in that same October 6, 2025, telephone call, Plaintiff was notified that he was now the subject of a fourth investigation and immediately, once again, under suspension, without pay for up to sixty days. The latest allegation is that Plaintiff was in violation of the PDA Confidentiality Policy. This was over his allegedly handing out a flyer containing supposedly confidential PDA information at a public town hall meeting on September 23, 2025. Of course, at this time Plaintiff was solely a private citizen not then in the employ of the PDA and there was nothing confidential in the flyer.

77.    To date, Plaintiff remains wrongfully harassed, accused, and retaliated against as a result of his protected conduct to faithfully comply with the law.

## COUNT I

**VIOLATION OF RIGHTS UNDER THE UNITED STATES CONSTITUTION and THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. SEC. 1983**
**Violation of First Amendment Freedom of Speech & Association, Due Process and Retaliation Thereunder**

**Richard Llewellyn v. Governor Josh Shapiro in his Official Capacity Prospectively, Ann M. Korb individually as Human Resources Manager of the Governor's Office of Administration, Althia O. Bennett, Esquire individually as member of the Office of General Counsel and Chief Counsel for the PDA, Deborah Hargett-Robinson, Esquire, individually as Deputy Chief Counsel of the Office of General Counsel assigned to PDA, Johnathan Bownam, individually as Deputy Secretary of the PDA, Jason Kavulich, individually as Secretary of Aging, and John and Jane Does #1-#10.**

78.    Plaintiff restates and realleges paragraphs 1 through 77 as though set forth here in full.

79.    The above named individual defendants, with the possible exception of Governor Josh Shapiro, have discriminated against the Plaintiff by depriving him of his rights, privileges and immunities secured by the Constitution or laws of the United States as applied to the States pursuant to the Fourteenth Amendment by repeatedly placing him on unpaid leave from his employment and retaliating against him as a result of his lawfully complaining about PDA's non-compliance with the Right to Know Law. Repeatedly those defendants named in their individual capacities, Pennsylvania, have, abridged Plaintiff's Due Process and First Amendment rights to free speech and association with appropriate investigatory agencies and personnel. Their conduct has been intentional, deliberate, willful, and conducted in callous disregard of Plaintiff's rights and applicable law.

80.    Given the need for prospective relief from a party in a position to stop his administration's further violation of Pennsylvania RTK law and Pennsylvania's OAPSA, the

25

Pennsylvania Whistleblower Law and Plaintiff's constitutional rights under the Section 1983,

Governor Josh Shapiro is named in his official capacity with a request that this Court enjoin his

administration from further ongoing violations of law and retaliation against Plaintiff. He is sued

in this matter expressly based on the Supreme Court's ruling in *Ex Parte Young*, 209 U.S. 123

(1908)

81.     To establish a claim for First Amendment retaliation, a Plaintiff must show: "(1)

constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary

firmness from exercising his constitutional rights, and (3) a causal link between the

constitutionally protected conduct and the retaliatory action.". *Thomas v. Independence Twp.,*

463 F.3d 285. 296 (3d/ Cir 2006) (further citation omitted).

82..     Plaintiff has been repeatedly suspended without any semblance of due process.

83.     Plaintiff has engaged in constitutionally protected activities and should have

received due process. Simply stated, defendants named have failed to afford Plaintiff due process

and have retaliated against him for both engaging in protected speech and related protected

activities in attempting to uphold the law.

84.      As a direct and proximate result of this retaliatory action, Plaintiff has repeatedly

been falsely stigmatized as having done something wrong,  has suffered and will continue to

suffer embarrassment, humiliation, financial harm, emotional and psychological harm, and pain

and suffering, some or all of which may be permanent.

85.     As a direct and proximate result of this retaliatory action, Plaintiff has incurred

attorneys' fees and other costs.

86.     By reason of Defendants' actions, Plaintiff is entitled to all legal and equitable

remedies available.

WHEREFORE, Plaintiff demands judgment in his favor and against the named individual defendants and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic loss, punitive damages, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper. As per the prospective relief to be accorded Plaintiff against Defendant Governor Josh Shapiro, Plaintiff requests that as the chief officer of the Executive Branch that be enjoined from continuing his administration's from violating the laws referenced hereinabove, improperly shielding the public from accurate information as to the deplorable state of Pennsylvania's Protective Services for the elderly, and further retaliating against Plaintiff.

### COUNT II

**VIOLATION OF PA's "OLDER ADULTS PROTECTIVE SERVICES ACT ACT OF NOVEMEMBER 6, 1987, P.L. 381 No. 79**

**Richard Llewellyn v.  Ann M. Korb individually as Human Resources Manager of the Governor's Office of Administration, Althia O. Bennett, Esquire individually as member of the Office of General Counsel and Chief Counsel for the PDA, Deborah Hargett-Robinson, Esquire, individually as Deputy Chief Counsel of the Office of General Counsel  assigned to PDA, Johnathan Bownam, individually as Deputy Secretary of the PDA, Jason Kavulich, individually as Secretary of Aging, and John and Jane Does #1-#10.**

87.     Plaintiff  restates and realllege paragraphs 1 through 86 as though set forth here in full.

88.     The PDA has been formally charged by the Older Americans Act (42 U.S.C.A. Sec 3025(a) and the Pennsylvania General Assembly with being an advocate and protector for the interests of older Pennsylvanians. Pennsylvania's Older Adults Protective Services Act ("OAPSA") provides at Section 102 that  "It is declared the policy of the Commonwealth of

Pennsylvania that older adults who lack the capacity to protect themselves and are imminent risk of abuse, neglect, exploitation or abandonments shall have access to and be provided with services necessary to protect their health, safety and welfare."

89.    Section 103 of the OAPSA provides a definition for "Protective Services" as "Those activities, resources and supports provided to older adults under this act to detect, prevent, reduce or eliminate abuse, neglect, exploitation and abandonment."

Key to the provision of Protective Services and detection, prevention and elimination of neglect, exploitation and elderly abandonment is PDA's collection and maintenance of accurate data pertaining to Protective Services and the provision of complete and accurate responses to media and other  RTK inquiries pertaining to the state of  delivery, or failure  thereof, of "Protective Services" in Pennsylvania.

90.    Section 301 provides for the Duties of the PDA and the area agencies on aging. First and foremost, Section 301 (a) stresses the importance of "Public information and interdepartmental consultation.—The department shall conduct an ongoing campaign designed to inform and educate older adults, professionals and the general public about the need for an availability of protective services under this chapter." Further language refers to the need for an "ongoing public awareness campaign."  Key to that "public awareness campaign" is the provision of accurate responses to media and other RTK inquiries pertaining to the state of delivery, or failure thereof, of "Protective Services:  in Pennsylvania."

91.    Section 103 of OAPSA also provides a  definition of "intimidation" as "An act or omission by any person or entity toward another person which is intended to, or with knowledge that the act or omission will, obstruct, impede, impair, prevent or interfere with the administration of this act or any law intended to protect older adults from mistreatment."

92.     Totally aside from the provisions of the Right to Know Act, this definition of "intimidation" succinctly and accurately describes the treatment of Plaintiff by all of the named individuals and entities/ departments named hereinbefore.

93.     Section 302 (c)  and (c.1) respectively provide penalties for Retaliatory action and Intimidation, both of which have been experienced by Plaintiff as a result of his complying with the terms of the act.

94.     Section 302 (c ) reads as follows:

> Retaliatory action; penalty.—Any person making a report of or cooperating with the agency, including providing testimony in any administrative or judicial proceedings, and the victim shall be free from discriminatory, retaliatory or disciplinary action by an employer or other person or entity. Any person who violates this subsection is subject to a civil lawsuit by the reporter or the victim wherein the reporter or victim shall recover treble compensatory damages, compensatory and punitive damages or $5,000 whichever is greater.

95.     Plaintiff is expressly protected by Section 301(c) as a person responsible for making a report, consisting of RTK responses and who otherwise cooperates with local area agencies on aging  ("AAAs") when it comes to the provision of Protective Services. Moreover, Plaintiff has provided testimony in administrative proceedings conducted by the OSIG and Auditor General. Further, all as set forth previously herein, Plaintiff has repeatedly been discriminated against, retaliated against and disciplined by his direct employer and other persons named herein as Defendants.

96.     Section 301 (c.1) reads as follows:

> Intimidation; penalty.—Any person, including the victim, with knowledge sufficient to justify making a report or cooperating with the agency, including possibly providing testimony in any administrative or judicial proceedings, shall be free from any intimidation by an employer or by any other person or entity. Any person who violates this subsection is subject to civil lawsuit by the person intimidated or the victim shall recover treble compensatory damages, compensatory and punitive damages, or $5,000 whichever is greater.

97.     Plaintiff is expressly protected by Section 301 (c.1) and the OAPSA definition of "Intimidation" which consists of " An act or omission by any person or entity toward another person which is intended to, or with knowledge that the act or omission will, obstruct, impede, impair, prevent or interfere with the administration of this act or any law intended to protect older adults from mistreatment.( Def. Added June 9, 1997, P.L. 160, No. 13)  Plaintiff fits the definition of a  "person" subjected to behavior "which is intended to, or with knowledge that the act or omission will, obstruct, impede, impair, prevent or interfere with this act ." Moreover, as indicated above, Plaintiff has made reports, and cooperated with and provided testimony in administrative proceedings conducted by the OSIG and Auditor General. As set forth hereinabove, Plaintiff has experienced intimidation by his employer and the other named Defendants.

WHEREFORE, Plaintiff demands judgment in his favor and against each of all the  Defendants named,  requesting an award of relief against each Defendant including, but not limited to treble compensatory damages and punitive damages, or $5,000, whichever is less,  and other relief as permitted under the law and as this Court deems just and proper.

## COUNT III

### VIOLATION OF THE PENNSYLVANIA RIGHT TO KNOW LAW
### ACT OF FEBRUARY 14, 2008, P.L. 6, No. 3

**Richard Llewellyn v.  Ann M. Korb individually as Human Resources Manager of the Governor's Office of Administration, Althia O. Bennett, Esquire individually as member of the Office of General Counsel and Chief Counsel for the PDA, Deborah Hargett-Robinson, Esquire, individually as Deputy Chief Counsel of the Office of General Counsel  assigned to PDA, Johnathan Bownam, individually as Deputy Secretary of the PDA, Jason Kavulich, individually as Secretary of Aging, and John and Jane Does #1-#10.**

98.      Plaintiff restates and reallege paragraphs 1 through 97 as though set forth here in full.

99.      Pennsylvania's Right to Know Law ("RTK Law") specifically requires the provision of  access to public information from each Commonwealth agency, the definition of which includes "any office, department.... of the executive branch . Specific reference is made to the inclusion of the Governor's Office and organizations "intended to perform an essential governmental function." ( Section 102 Definition of "Commonwealth Agency." )

100.      The RTK Law defines a "Record" as "Information regardless of physical form or characteristics, that documents a transaction or activity of any agency and that is created, received or retained pursuant to law or in conjunction with a transaction, business or activity of the agency. The term includes a document, paper, letter, map, book, tape, photograph, film or sound recording, information stored or maintained electronically and a data-processed  or image processed document."  Section 305 sets forth the presumption that a record in the possession of a Commonwealth agency "shall be presumed to be a public record."

101.      RTK Law Section 301 requires the PDA to provide public records in accordance with the act and prohibits the PDA from "denying a requester access to a public record due to the intended use of the public record by the requester..."  As set forth hereinbefore, Defendant Bowman, together with the other named and unnamed  Defendants,  wanted to deny or restrict responses to RTK requests made by the media.

102.      RTK Law Chapter 7 sets forth a Procedure, mandating at 701 that a public record shall be accessible for inspection and duplication.  Moreover, 708 specifies that the burden of proving that a record is exempt from public access shall be on the Commonwealth agency

receiving a request. Exceptions are set forth at 708 (b) none of which have been at issue with respect to RTK requests referenced hereinabove.

103.      RTK Law Chapter 9 is headed "Agency Response" setting forth a "General rule" at Section 901 thereof that "Upon receipt of a written request for access to a record, an agency shall make a good faith effort to determine if the record requested is a public record..... and whether the agency has possession, custody or control of the identified record ...." The facts as alleged hereinabove depict anything but a good faith effort by the Commonwealth and the other named Defendants.

104.      Chapter 13 provides for Judicial Review of the process with provisions for court costs and attorney fees (Section 1304) and civil penalties (Section 1305) for denial of access to a public record in bad faith. Section 1310 specifically provides for the establishment of an "Office of Open Records" to provide annual training courses to agencies, public officials and public employees.

WHEREFORE, Plaintiff requests a declaration from this Court that Defendants have violated the terms of the RTK law and demands judgment in his favor and against Commonwealth of Pennsylvania and each of all the Defendants named, requesting an award of relief against each Defendant including, but not limited to the civil penalty of $1,500 per defendant for denial of access to a public record in bad faith and other relief as permitted under the law and as this Court deems just and proper.

## **COUNT IV**

### **VIOLATION OF PENNSYLVANIA WHISTLEBLOWER LAW**
43 P.S. § 1421, *et seq*

### **Richard Llewellyn vs. Defendant Commonwealth of Pa**

105.    Plaintiff  restates and realllege paragraphs 1 through 104  as though set forth here in full.

106.    Pennsylvania law provides Plaintiff with relief pursuant to the Pennsylvania Whistleblower Law, 43 P.S. § 1421, *et seq.* ("Whistleblower Law").

107.    The Commonwealth of Pennsylvania  is subject to the Pennsylvania Whistleblower Law as Plaintiff's "Employer" directly paying him as such .

108.    By making written and verbal good faith reports of waste and wrongdoing as set forth hereinabove, Plaintiff comes within the definition of a whistleblower under this law as "a person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority."

109.    As set forth hereinabove, Plaintiff fits within the protected class of employees under the Whistleblower Law, as he was retaliated against as a result of engaging in protected conduct. Specifically, **§**1423(a) thereof provides that "No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employer's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste."

110.    By reason of the Defendant Commonwealth's actions exercised by the named Defendants, Plaintiff is entitled to all legal and equitable remedies available.

WHEREFORE, Plaintiff demands a trial by jury and judgment in his favor and against Defendant Commonwealth of Pennsylvania and requests an award of relief including, but not limited to compensatory damages, including any and all recoverable economic and noneconomic

loss, reasonable attorneys' fees and costs, and other relief as permitted under the law and as this Court deems just and proper.

**MARK D. SCHWARTZ, ESQUIRE**

By:  /s/ Mark D. Schwartz
       Mark D. Schwartz, Esquire (Pa ID #30527)
       P.O. BOX 330
       BRYN MAWR, PA 19010
       Telephone & Fax 610 525-5534
       Markschwartz6814@gmail.com

DATE: November 26, 2025